## DAVIS v. BRONSON.

Generally speaking, the validity of a contract is to be determined by the law of the place where made. If valid there, it is by the general law of nations, held valid everywhere, by the tacit or implied consent of the parties.

But this rule is subject to important exceptions, viz: 1. That neither the State nor its citizens may suffer any injury or inconvenience, by giving legal effect to the contract; 2. That the consideration of the contract be not immoral, and the giving effect to it will not have a bad tendency, or exhibit to the citizens of the State, an example pernicious and detestable; 3. That the contract be not opposed to the policy and institutions of the State where it is sought to be enforced.

To give effect to contracts made out of the State, is an act of comity due from the courts of the State in which the are sought to be enforced, to

Davis v. Bronson.

the State in which they were made. The *lex loci* is to be adopted in deciding on the nature, validity, and construction of the contract. So far the obligation of the law of comity extends, but no farther.

A State may say how far the laws of another State are to be enforced by her courts ; and this, without impairing the obligation of contracts.

Contracts which are in evasion or fraud of the laws of a country, or of the rights or duties of its subjects—against good morals, or against good religion—or against public right ; and contracts opposed to the national policy, or national institutions, are deemed nullities in every country affected by such contracts, although they may be valid by the laws of the place where made.

No State is bound to lend the assistance of its courts to enable a party to evade or contravene its laws, or to enforce a contract subversive of its policy or institutions, although the contract may have been valid in the place where made, and might have been enforced in the courts of that State.

A contract made in another State, with intent to enable the defendant to sell intoxicating liquors within this State, in violation of the act for the suppression of intemperance, approved January 22, 1855, is opposed to the policy of the State, and cannot be enforced in our courts.

Section five of the act for the suppression of intemperance, which provides that "no action of any kind shall be maintained in any court of this State, for intoxicating liquors, or the value thereof, sold in any other State or country, contrary to the laws of said State or country, or with intent to enable any person to violate any provision of this act," is not unconstitutional and void, as operating to impair the obligation of contracts.

Laws made prior to the formation of a contract, cannot impair its obligation, because all existing laws enter into the contract when made, and define and determine it.

Where in an action to recover the value of certain intoxicating liquors, the defendant answered, alleging that the said liquors were sold to defendant by plaintiff, in the State of Illinois, in the year 1857, with intent to enable the defendant to violate the statute and laws of the State of Iowa ; that the same were shipped from Chicago directed to defendant at Iowa City, in Johnson county, with the knowledge that the defendant was not the agent of said county, for the sale of intoxicating liquors ; that the same were intended to be sold in said county, without authority, and contrary to the statute of Iowa, in such cases made and provided ; and that at the time of the sale and shipment aforesaid, the said defendant was not the agent of said county, authorized to sell intoxicating liquors in said State ; to which answer a demurrer was filed, and overruled by the court ; *Held*, That the demurrer was properly overruled.

*Appeal from the Johnson District Court.*

WEDNESDAY, OCTOBER 13.

This is an action to recover the value of certain brandy, wine, ale, porter, schnapps, &c., alleged to have been sold and delivered to defendant, by the plaintiff. The defendant answered that the same were intoxicating liquors, sold to defendant by the plaintiff, in the State of Illinois, in the year 1857, with intent to enable the defendant to violate the statute and laws of the State of Iowa; that the same were shipped from Chicago, directed to defendant at Iowa City, in Johnson county, with the knowledge that the defendant was not the agent of said county for the sale of intoxicating liquors; and that the same were intended to be sold in said county, without authority, and contrary to the statutes of Iowa in such case made and provided. And defendant avers that at the time of the sale and shipment aforesaid, he was not the agent of said county, authorized to sell intoxicating liquors in said State.

To this answer there was a demurrer, which was overruled by the court. The plaintiff stood upon his demurrer, and judgment was rendered for the defendant. The plaintiff appeals, and assigns for error the overruling the demurrer.

*Theodore M. Davis*, for the appellant.

I. As appears from the defendant's own showing, the contract for liquors was made in the State of Illinois, where no such law as is set up in defence exists; therefore, it could not have been in violation of the laws of that State, and was a good and valid contract in that State. A contract good and valid where made, is good every where, and can be enforced any where. *Trundy* v. *Vegnier*, 1 Big., N. C., 151; *Wellings* v. *Censeque*, 1 Pet., C. C., 317; *Pearsall* v. *Dwight*, 2 Mass., 88; *Smith* v. *Mead*, 3 Conn.,

253; *Neelley* v. *Hopkins*, 3 Conn., 473. Again: That a contract relating to moveables, is to be construed according to the law of the place where it is made, or the *lex loci contractu*. *Thorne* v. *Watkins*, 2 Ves., 54; *Holmes* v. *Runsen*, 4 Johns. Ch., 487; *Harvey* v. *Richards*, 1 Mason, 412; *Bruce* v. *Bruce*, 2 B. &. P., 229; and further on this point: The contract must be governed by the laws of the country where the contract was made. *Mede* v. *Roberts*, 3 Esp., N. C., 163. And we think that this is the universal rule: that if a contract was entered into in a State where it was good and valid, that it is, therefore, good here, and and can be enforced here. Therefore, we think that as defendants acknowledge that the contract was good where made, that they cannot set up in defence said "act for the suppression of intemperance."

II.   Our second ground of demurrer is founded on this point: That the contract being valid and legal when and where made, cannot be vitiated or affected by the laws of Iowa; and to sustain the position that we assume, we cite 11 How., 464, in which case the following decision was rendered: "That if a contract is entered into in another State, in conformity to the local law, to have its effect and execution there, the courts of Louisiana cannot declare it a nullity, on the ground that it would not be valid according to the laws of said State, even if one or both of the contracting parties were not citizens of said foreign State; and we find in *Orcutt* v. *Nelson*, 1 Gray, 541, the following decision: "The court are therefore of opinion that a sale of liquors in Connecticut, without any fraudulent view to their re-sale in Massachusetts, was not unlawful, and that an action may be maintained in this commonwealth for the price of the liquors sold. We go farther than this, and say, that if a guilty knowledge is admitted by us, or rather, that if the goods were sold with a knowledge of their re-sale, that even then, we can recover in this State, provided we have no interest in the re-sale, and are to derive no benefit from the violation of the law." *McIntyre* v. *Park*, 3 Metc., 207. We quote from the de-

cision in the cases of *Holman* v. *Johnson*, Cowp., 341, and *Hanny* v. *Eve*, 3 Cranch, 242, in which the following points were decided, viz : That in a case where goods were sold to an Englishman in France, by a Frenchman, for the known purpose of being smuggled into England, still that the Frenchman could maintain his suit in England for the price of the goods, upon the ground that the sale was complete in France, and that the party had no connection with the smuggling transaction. The contract was complete, and nothing left to be done. We think that this is a parallel case with ours, for, as appears from their own showing, the contract was complete when the goods were delivered at the depot in Chicago ; that the sale and delivery was made at Chicago, in Illinois, and from all that appears the plaintiff was not to receive any benefit from the re-sale ; and it is reasonable and just to suppose that such was the case. It was held in Massachusetts, where lottery tickets were sold to a citizen of Massachusetts, in the State of New York, such sale being prohibited by the laws of Massachusetts, that the value of said tickets could be recovered in the State of Massachusetts, because such sale was good where made, and that the contract was completed in the State of New York. *McIntyre* v. *Parks*, 2 Metc., 207—substantially carrying out, and supporting the doctrine of *Holman* v. *Johnson*, Cowp., 341, and *Hanny* v. *Eve*, 3 Cranch, 242. Now we ask, if these cases have any weight or influence with the courts of this State, can they be influenced or guided by these decisions, and also by our laws ? We say that the law under which these decisions were rendered, were similar in relation to the validity of contracts ; and that still, the courts held, that even under the law, actions could be maintained ; therefore, our position, that the act set up is no defence to the plaintiff's cause of action, is sustained.

III. This brings us to the third ground of demurrer, and the only one that remains to be argued, and it is this : Any contract being valid where made, cannot be affected or defeated by the laws of Iowa, as such laws impair the

obligation of contracts, and are null and unconstitutional. We admit that the legislature has power to pass laws changing the remedy, and rendering it less speedy and convenient in enforcing contracts, but we say, that when they leave no substantial remedy—take away all means of enforcing the same—that then they come in direct conflict with the constitution.    *James* v. *Stall*, 9 Barb., 482. With that portion of it, particularly, which is embodied in the twenty-first section of the Bill of Rights, which declares that "no law impairing the obligation of contracts shall ever be passed." Now let us see what is the obligation of a contract, and secondly, what impairs it. "A contract is an agreement in which a party undertakes to do, or not to do, a particular thing." This, then, is a contract, or the legal definition of a contract. "The law binds him to perform his undertaking; and this is the obligation of his contract. Any law which releases a part of this obligation, must, in the literal sense of the word, impair it. Much more so must a law impair it, which makes it totally invalid and entirely discharges it.    Chief Justice Marshall, in *Sturges* v. *Crowninshield*, 4 Wheaton, 197. Now we suppose that the only question, or, rather, fact, that it is necessary for us to establish is, that this "act for the suppression of intemperance" impairs the obligation of contracts; for if it does, then certainly this law is unconstitutional and void. We have seen what a contract is, in legal contemplation ; also that which constitutes the obligation of a contract. Therefore, let us look at this act, and ascertain what it seeks to do. It says : "All sales, transfers, mortgages, liens, attachments, pledges, and securities of every kind, whether given in whole or in part for liquor, shall be void," and further, "that no action of any kind shall be maintained in any court of this State for the value of intoxicating liquors." Laws of 1854, section 15, 68. Now, does this law release a debtor, in part, from the obligation of his contract? We contend that it not only releases him in part, from his obligation, but that it goes much farther, and strikes at the very bottom

of his contract, saying as plain as a law can say, that the obligation of your contract is entirely destroyed—you are entirely free; for certainly a contract that has any obligation can be enforced in any court, and in any State; and, in fact, the only way in which the legislature could possibly reach this point, without violating every principle and rule of law, was, by destroying the obligation of a contract, and then saying your contract has no obligation, and therefore, of course, cannot be enforced. Another definition of the law, we find in Institutes, Lib. 3, Tit. 14. "An obligation is the chain of the law, by which we are necessarily bound to make some payment according to the law of the land." Is it not apparent, that if this be true, that the "chain of the law that binds us to make payments" on our contracts, constitutes the obligation of our contract—that this act, when sought to be applied to contracts entered into out of the State, not only takes from that chain one link, but destroys the whole chain? And if this be so, is not this act in direct conflict with the constitution of this State?

As we stated in the first part of this argument, "a contract good where made, is good everywhere." It cannot be denied but that this contract was good where made, and that it was entered into in good faith. Can, then, we ask, such a law be constitutional, which says that all contracts shall be null and void, and that no action of any kind, can be maintained on such a contract. If this act is constitutional, and can be set up in defence, what will it lead to? A citizen of this State could enter into as many obligations as he pleased with a citizen of a foreign State, such a contract being good and valid where made; and as a citizen is not bound to know the laws of a foreign State, (1 Burge on Col. and For. Law, Pa., 1 Ch., 4) therefore, even if he knew that the goods were to be shipped to this State, he would still consider that he was entering into a contract that could be enforced the world over; but as soon as the merchandise reached this State, the purchaser could "take advantage of his own wrong," and defraud

an innocent party out of his just dues.   It can be readily
seen what this would lead to.   It would open a door to
the citizens of this State to commit the greatest frauds
with impunity.   Not only would they be defended and
sustained in so doing, by a law that impairs and entirely
destroys the obligation of contracts, but by a law that impli-
edly says, that a contract, good where it is made, even if
it be of the most solemn character, would be of no validity
here, nor could it be enforced, and in so doing violate
one the plainest and best settled principles of law.   Not
only would the wheels of commerce be blocked, but if
this law is constitutional, and can be enforced, when ap-
plied to contracts effected outside of this State, the credit
of this State would be ruined.   There are plenty of men
residing in this State who would take advantage of this
act, and in so doing would not only rob innocent men of
foreign States, but would deprive us all of our characters
for honesty, and would cast upon our laws a slur and
stigma that it would take years to remove.

Our last ground of demurrer, and the last point that we
shall argue, is as follows :   The facts alleged in said answer
constitute no defense to plaintiff's cause of action.   We
find in Story on Conflict of Law, 252, the following:  "In
certain places particular merchandise is prohibited.   If
sold there, the contract is void.   But if the same merchan-
dise is sold in an other place, where there is no such pro-
hibition, and a suit is brought upon the contract, in the
place where the prohibition exists, the buyer will be
held liable, because the contract was, in its origin, valid."
On this ground we hold that the matter set up in defense
constitutes no defense to plaintiff's cause of action.   We
hope that this question will be fully and fairly considered
by your Honors.

*Edwards & Ransom*, for the appellee.

The whole question for the consideration of this court
is : Does the statute referred to conflict with the constitu-

tional provision with respect to impairing the obligation of contracts? or does this contract come under the rule that a contract good where made, is valid everywhere.

As a general rule the laws of one State have no force or efficiency beyond the boundaries of that State. Whatever effect is given to the laws of Illinois by our courts, is from courtesy and comity, and not as a matter of right. And our courts will decide as to how far this comity should extend, and will see that the dignity of our laws and the rights of our people shall be maintained and preserved. Story's Con. Laws, 370, section 244.

That the legislature of this State had the right to pass the act in question, and render contracts made within this State in violation thereof, and after its passage, void, cannot be questioned. It is essentially a police regulation; and if a foreign article be injurious to the health and morals of a community, "a State may, in the exercise of that great and conservative police power which lies at the foundation of its prosperity, prohibit the sale of it." Taney, J., in the License Cases, 5 Howard, 504 *et seq.* And the same justice in those cases says: "The acknowledged police power of a State often extends to the destruction of property—a nuisance may be abated—everything prejudicial to the health or morals of a city may be removed; merchandise from a port where a contagious disease prevails, being liable to communicate the disease, may be excluded, or even thrown into the sea. This comes in direct conflict with the regulations of commerce, and yet no one doubts the local power. It is a power essential to self-preservation. It is the law of nature, and is possessed by man in his individual capacity. He may resist that which does him harm, whether he be assailed by an assassin, or approached by poison." And the same doctrine has been affirmed by this court in *Santo et al.* v. *The State of Iowa*, 2 Iow,a 165, and cases there cited.

Does a citizen of another State, then, when he acts in fraud, evasion, or violation of our laws, and with the express intention of enabling a citizen of this state to violate

Davis v. Bronson.

those laws, possess any greater rights, or more enlarged privileges, than one of our own citizens, guilty of the same wrongs? or do contracts made without the boundaries of our State, and without the jurisdiction of our courts, when they are made in fraud or evasion of our laws, as in the case at bar, with the knowledge of, and intent to violate such laws, or to enable one of the parties to such contract to do so, possess any more binding force or efficacy than contracts made in our own State under, the same circumstances? And will our courts allow foreign persons to claim their protection, and enforce remedies with their assistance, with regard to contracts made and-acts done, knowingly and wilfully in violation of our laws, and in a manner insulting to our dignity?

If an affirmative answer to these questions is given, it must be upon the principle, that the comity of nations is extended without limit or exception, to all parties making contracts in a foreign State, and that all contracts made in such foreign State, no matter how odious to us, or however much they may interfere with our police regulations, if valid where made, may be enforced in our courts.

The principle does not by any means extend so far, but is modified by numerous exceptions.

No nation or State is bound to recognize any contracts, or enforce them, which are injurious to its own interests, or to those of its own subjects, (Story Conf. Laws, section 244), and in the language of Marshall, J., in 8 Martin, 95, 97, the same exception "applies to cases in which the contract is immoral, or unjust, or in which the enforcing it in a State, would be injurious to the rights, the interests, or the convenience of such State or its citizens." And there are further exceptions, such as contracts made in evasion or fraud of a country, or rather of its laws, of the rights or duties of its subjects, contracts against good morals, or against religion, or against public rights, &c. Story Conf. Laws, sections 244, 245, 6, 7.

The reason why this international comity has been established is, that innocent parties may be protected;

that persons in making contracts are in ordinary cases, supposed to know, and have reference in their acts and contracts only to the local law where such acts are done, or such contracts are made. The courts delight in the protection of the innocent, and in aiding them in procuring their rights; but the reason of the rule, and its good sense cease, when it is attempted to be applied to cases like the one at bar, where the party seeking to enforce the remedy was not innocent, and where he shows that he did not have reference solely to the laws of Illinois, but intended to be accessory to a palpable violation of the law of this State.

We contend, therefore, that this contract cannot be interpreted under the general rule referred to, i. e. "That a contract good where made, is valid everywhere;" but that it clearly comes under several of the exceptions to that rule above mentioned.

The only cases referred to by the appellant's counsel, which would seem for a moment to sustain the grounds taken by him, are the cases from Cowper, 346, and *McIntyre* v. *Park*, 3 Metc., 207. In these cases, the seller of goods sold to a resident of a foreign State, with the knowledge that the goods were to be re-sold in a foreign State, (where the seller sought his remedy), contrary to law. The case at bar is different, and more strictly comes under the exceptions referred to. Here the plaintiff below sold the liquors, not merely with the knowledge that they were to be re-sold in the State contrary to law, but also with the intent to enable the defendant below to violate the provisions of our statutes. He had not only the knowledge that a wrongful act was to be done, but made himself a party, or a kind of accessory to the defendant, in the perpetration of that wrong. The intention to assist the defendant below in violating our law, entered into and formed a part of the contract. The simple knowledge might not be sufficient, perhaps, to show that the plaintiff acted and made the contract in fraud or evasion of Iowa laws, but a deliberate intention

Davis v. Bronson.

to " enable the defendant to violate, &c.," most clearly do establish that fact.

The authority of the two cases above mentioned (3 Metc. 207, and in Cowper) is, however, denied by Story J., in his Conf. Laws, section 253. He quotes an opinion of C. J. Eyre, as follows: "Upon the principles of the common law, the consideration of every valid contract must be meritorious. The man who sold arsenic to one who he knew intended to poison his wife with it, would not be allowed to maintain an action upon his contract. The consideration of the contract is tainted with turpitude which destroys the whole merit of it. No man ought to furnish another with the means of transgressing the law, knowing that he intended to make that use of them." This reasoning, says Story, "seems positively unanswerable." Ib.

The same doctrine has been affirmed in other cases. So, in *Langton* v. *Hughes*, Lord Ellenborough said, (the court of King's Bench all concurring), "If a person sell goods with a knowledge, and in furtherance of the buyer's intention to convey them upon a smuggling adventure, he is not permitted by the policy of the law to recover such a sale." And in the same case, Bayley, J., said, "If a principal sell articles in order to enable the vendee to use them for illegal purposes, he cannot recover the price"—an extract parallel to the case at bar. See, also, Story Conf. Laws, section 254, and cases there cited.

The case of *Orcutt* v. *Nelson*, 1 Gray, 541, referred to by appellant's counsel, impliedly sustains the same principle in which the court say, " that a sale of liquors in Connecticut, without any fraudulent view to their resale in Mass., contrary to law, was not unlawful," &c. So, also, the case of *Hannay* v. *Eve*, 3 Cranch, 242, referred to by appellant's counsel, is directly in favor of our position. And see sections 254, 255 Story Conf. Laws, cases cited, and note with remark of commentator.

From the authorities, therefore, and from a consideration of the reasons which lie at the basis of international

comity, we believe that a suitor who has placed himself in the position of the appellant—who has known that when he made the contract sought to be enforced, it was in violation of our laws, and made with the intent to enable another to violate those laws, and in fraud and evasion of them—will not, nor ought to be, placed on any better footing in our courts, than any one of our own citizens guilty of the same offence,. and that our courts will not permit, under sanction of their courtesy, or of international politeness, a border warfare to be waged upon our institutions by evil disposed persons of other States; nor will they extend their protection to persons who place themselves in this hostile position.

The law of Iowa, above referred to, can in no sense be said to impair the obligations of this contract, for in order to impair an obligation, the obligation must have existed when the law took effect. The law of Iowa is not intended to be retrospective in its character, and it is not contended in this case that it is of such a character. Mr. Parsons, in his work on contracts, says: "The latter, (viz: laws enacted subsequent to the formation of the contract), may certainly impair the obligation of contracts, while the former, (viz: laws enacted prior to the formation of the contract), certainly cannot, because all existing laws enter into contracts made under them, and define and determine that contract." 2 Par. on Conts., 537. How can the obligation of this contract in the· case at bar, be impaired by the act of Iowa in question, when the contract was made long after the passage of the act, and, as the terms of the contract show, with direct reference to the act?

It seems to us that the law of Iowa goes to the remedy of the party so far as all contracts made under these circumstances, since its passage, are concerned, and can in no manner be said to affect the contract itself. Our legislature has told the world, that the sale of intoxicating liquors, for certain purposes, is injurious to the morals, order and happiness of our people, and impedes their

prosperity; that the traffic in those articles must be, and is, prohibited; that parties making contracts for the sale of intoxicating liquors in this State, after the passage of the act, cannot enforce them in our courts, and that contracts made in other States in good faith, and without any fraudulent design, or intent to violate our statutes, may also be enforced in our courts: but that parties in other States, who, knowing our laws, make contracts in violation of them, and act with an intent to violate those laws, and to enable other persons so to do, can have no remedy in our courts on such contracts. We contend that our legislature had a right, and it was their duty, with regard particularly to a police regulation of so much importance, so to speak and enact. The contract is still enforceable in Illinois; it is not therefore affected by the law in question. The remedy of the party is simply taken away.

STOCKTON, J.—The defence is based upon the fifteenth section of the " act for the suppression of intemperance," which provides that " no action of any kind shall be maintained in any court of the State for intoxicating liquors, or the value thereof, sold in any other State or country, contrary to the laws of said State or country, or with intent to enable any person to violate any provision of this act; nor shall any action be maintained for the recovery or possession of any intoxicating liquors, or the value thereof, except in cases where persons owning or possessing such liquors with lawful intent, may have been unlawfully deprived of the same. Act of January 22, 1855, section 15. The authority of this statute, must be paramount with us, and is decisive of this cause, unless, as is contended by plaintiff, it is not intended to apply to the case made by him, or is unconstitutional and void, as impairing the obligation of contracts.

It is claimed by plaintiff that the contract is to be construed according to the law of Illinois, where made; and if valid there, it is valid every where else, and cannot be rendered invalid by the law of Iowa.

" There can be no doubt," says Lord Mansfield, in *Holman* v. *Johnson*, Cowper, 341, " but that every action tried here, must be tried by the law of England; but the law of England says, that in a variety of circumstances, with regard to contracts legally made abroad, the laws of the country where the cause of action arose, shall govern." *Male* v. *Roberts*, 3 Espinass N. P., 163. Generally speaking, the validity of a contract is to be decided by the law of the place where it is made—*lex loci contractu*. If valid there, it is, by the general law of nations, held valid everywhere, by the tacit or implied consent of the parties. Story's Conflict of Laws, section 242. The plaintiff states the rule in language stronger—that if the contract is valid where made, it is valid everywhere, and cannot be rendered invalid by the law of any other State. To give effect to contracts made out of the State, is an act of comity due from the courts of the State in which they are sought to be enforced, to the State in which they are made. The *lex loci* is to be adopted in deciding on the nature, validity and construction of the contract. So far, the obligation of the law of comity extends, but no farther. *Pearsoll* v. *Dwight*, 2 Mass., 88. So, a contract made in a foreign place, to be there executed, if valid by the laws of that place, may be a legitimate ground of action in the courts of this State, although such contract may not be valid by our laws, or even may be prohibited to our citizens. Contracts for a greater rate of interest than is allowed by the State where they are attempted to be enforced, are instanced as an illustration of this rule. *Greenwood* v. *Curtis*, 6 Mass., 378. But where upon a contract made in New York, and to be there performed, the parties both being residents of that State, a suit was brought in Massachusetts, it was held that the statute of limitations of New York could not be pleaded in bar of the action. *Pearsoll* v. *Dwight*, 2 Mass., 88. The rule, however, is subject to important exceptions:  1. That neither the State, nor its citizens may suffer any injury or inconvenience by giving legal effect to the contract; which should not, in itself, nor in the means used to give

it effect, work injury to the country where it is attempted to be enforced. Story on Conflict of Laws, sec. 244; *Greenwood* v. *Curtis, supra; Ohio Ins. Co.* v. *Edmondson,* 5 Louis., 295. 2. That the consideration of the contract be not immoral, and the giving effect to it will not have a bad tendency, or exhibit to the citizens of the State an example pernicious and detestible. No man ought to be heard in a court of justice, to enforce a contract founded in, or arising out of, moral or political turpitude, or in fraud of the just rights of any foreign nation. *Armstrong* v. *Toler,* 11 Wheaton, 258. 3. The contract must not be opposed to the policy and institutions of the State where it is sought to be enforced. In all such cases, the contracts will be held utterly void, whatever may be their validity in the country where they are made, as being inconsistent with the duties, the policy, or the institutions of the State where they are sought to be enforced. Story on Conflict of Laws, sec. 259.

It is not claimed by defendant that the law of Iowa operates extra-territorially, to repeal or supercede the laws of Illinois. The State may say how far, however, the laws of another State are to be enforced by her courts; and this, without impairing the obligation of any contract. The plaintiff, without recognizing the exceptions to the rule, claims for it an authority superior to that of our own legislature. The authority, (says Story), of acts and contracts done in other States, as well as the laws by which they are regulated, are not, *proprio vigore,* of any efficiency beyond the territories of that State; and whatever effect is attributed to them elsewhere, is from comity, and not of strict right. Every independent community will, and ought to, judge for itself, how far that comity ought to extend. The reasonable limitation is, that it shall not suffer prejudice by its comity. Confl. Laws, sec. 244. In cases turning upon the comity of nations, (says Mr. Justice Best), it is a maxim that the comity cannot prevail in cases where it violates the law of our own country, or the law of nature, or the law of God. Contracts, therefore, which are in

evasion or fraud of the laws of a country, or of the rights or duties of its subject— against good morals or against religion—or against public right; and contracts opposed to the national policy or national institutions, are deemed nullities in every country affected by such considerations, although they may be valid by the laws of the place where they are made. *Forbes* v. *Cochrane*, 2 B. & C., 448. The case of *Holman* v. *Johnson*, cited often in support of the doctrine contended for by the plaintiff, was for the price of a quantity of tea, sold and delivered to the order of defendant, at Dunkirk, by plaintiff, knowing it was to be smuggled into England. The plaintiff was to have no hand in the smuggling, but merely sold the tea to defendant, as to any other person in the ordinary course of trade. The defence was, that the contract for the sale of the tea was with an intention to make an illicit use of it, with the privity and knowledge of the plaintiff, and he was not, therefore, entitled to the assistance of the laws of England to recover the value of it. Lord Mansfield said : "No court will lend its aid to a man who founds his cause of action upon an immoral or illegal act. If the cause of action appears to arise *ex turpi causa*, or the transgression of a positive law of this country, then the court says he has no right to be assisted." "The question, therefore, is, whether in this case the plaintiff's demand is founded upon the ground of any immoral act or contract, or upon the ground of his being guilty of anything prohibited by a positive law of this country. An immoral contract it certainly is not, for the revenue laws themselves, as well as the offences against them, are *positivi juris*." And the court held, that as the plaintiff's contract was only to sell and deliver the tea at Dunkirk, although he knew what the buyer was going to do with it, yet, as he had no concern in the transaction itself, and as his intent was totally at an end by the delivery at Dunkirk, he had transgressed no law of England, and was entitled to recover. *Holman* v. *Johnson*, Cowper, 341.

The case of *Pellicat* v. *Angell*, 2 Crompt., Mees, &

Rosc., 311, was upon a bill of exchange accepted in France, by the defendant, a British subject, payable to the plaintiff, a Frenchman, being for the price of goods sold by the plaintiff to the defendant, in Paris, for the avowed purpose of being smuggled into England. The court held, that " where parties enter into a contract to contravene the laws of their own country, such contract is void ; but that the subject of a foreign country is not bound to pay allegiance to the revenue laws of another ; except that where he comes within the act of breaking them himself, he cannot, in such country, recover the fruits of his illegal act. But there is nothing illegal in merely *knowing* that the goods he sells, are to be disposed of in contravention of the fiscal laws of another country. It has never been said, that merely selling to a party who means to violate the laws of his own country, is a bad contract." In *McIntyre* v. *Parks*, 3 Metc., 207, the consideration of the assignment of a promissory note, was the sale of lottery tickets in New York, authorized by the law of that State, but prohibited in Massachusetts, where they were to be sold, and where suit was brought. It was held that it was no legal objection to the validity of the contract, that the plaintiff knew when the lottery tickets were sold to defendant, that he intended to sell them in Massachusetts. In *Orcutt* v. *Nelson*, 1 Gray, 536, the suit was brought to recover the price of brandy, gin, rum, &c., sold and delivered to defendant by plaintiff. The defence was, that they were intoxicating liquors, sold contrary to the statute of Massachusetts, regulating the sale of intoxicating liquors, the defendant not being an agent appointed according to law, to sell the same for medicinal, chemical, and mechanical purposes. The evidence showed that the liquors were ordered by mail, of the plaintiff, doing business at Hartford, Connecticut, who filled the order, and shipped the goods to defendant, residing in Massachusetts. The law of that State provided, that " no action of any kind shall be had or maintained in any court of this commonwealth, for the recovery or possession of intoxicating liquors, or the value thereof, except such as are sold in accordance with the

provisions of this act." The court held that all sales not prohibited by the terms of the act, or by necessary implication from those terms, were to be deemed made in accordance with the act, and that a sale of liquors in Connecticut, without any fraudulent view to their re-sale in Massachusetts, contrary to law, was not unlawful, and that an action might be maintained in Massachusetts for the price of the liquors so sold.

The result of these decisions, (says Story's Conflict of Laws, section 253), certainly is that the mere knowledge of the illegal purpose for which goods are purchased, will not affect the validity of the contract of sale of goods, intended to be smuggled into a foreign country, even in the courts of that country; but there must be some participation or interest of the seller in the act itself.

These are all the reported cases cited by the counsel, or met with in our researches, that go, even in appearance, to sustain the position assumed by the plaintiff. It is evident, however, that it is only in appearance that they sustain it. They do not go to the extent of holding, that if the goods are sold, as alleged in the answer of defendant, " with intent to enable the defendant to violate the laws of this State," the contract is valid and enforceable here; but it will be seen that, if it at all enters as an ingredient into the contract between the parties, that the goods shall be smuggled, or that the seller shall do some act to assist or facilitate the smuggling, or to assist, or be instrumental in breaking the laws of another State or nation, the seller is deemed an active party, and the contract will not be enforced.

A case exactly in point is that of *Weymell* v. *Reid*, 5 Durnford & East, 599. The defendants applied to the plaintiff, a foreigner at Lisle, for a quantity of lace, which he knew was to be smuggled into England; and for that purpose, it was to be packed by plaintiff in a peculiar manner, by the direction of defendant, for the more easy conveyance of it without discovery. The defence to the suit was, that it was a smuggling transaction; and it was held,

that as the plaintiff was concerned in giving assistance to the defendant to smuggle the goods, by packing them in a manner most suitable for, and with intent to aid that purpose, he cannot resort to the laws of England to assist him in carrying his contract into execution. The case did not rest merely in plaintiff's knowledge of the use intended to be made of the goods. If he undertook to deliver the goods in the manner shown, knowing the use intended to be made of them, he was offending against the laws of his country in the very contract itself. If the contract and delivery are complete abroad, and the seller does no act to assist in the illegal use to be made of the goods, the contract, it was held, would be valid, and might be recovered upon in England.

The cases of *Biggs* v. *Lawrence*, 3 Durnford & East, 454, and *Clugas* v. *Penaluna*, 4 Durnford & East, 466, were actions for the price of goods sold abroad, and packed in a certain way, to enable the defendant to smuggle them into England. The plaintiffs and defendants were English subjects. Though the contracts were made abroad, the court held, that they were to be considered as contracts made in England, and in direct violation of the laws of the country. Goods sold abroad, and delivered there in the fair course of trade, may be recovered for, though they be afterwards smuggled into England, (as in the case of *Holman* v. *Johnson*) ; but if the plaintiff assists in the act of smuggling, by packing the goods in a particular way, used for the purpose of smuggling, and with a view to evade the laws of the country to which they are to be exported, the whole transaction is tainted, and the seller cannot receive the aid of the laws of such country to recover their value.

A distinction made in the last named causes, between them and the cause of *Holman* v. *Johnson*, was, that in the former, the plaintiffs were English subjects, while in the latter the plaintiff was a foreigner. Subjects, it was held, should not be allowed to enforce in England, a contract in violation of the laws of their own country, though such a contract might be enforced in the like case by a foreigner.

The true doctrine would seem to be, (says Story's Conflict of Laws, section 255), to make no distinction whatsoever, between the case of a sale between citizens or subjects, and the case of a sale between foreigners ; but to hold the contract in each case to be utterly incapable of being enforced, at least in the courts of a country whose laws are thus designedly sought to be violated.

The case of *Lightfoot* v. *Lenant*, 1 Bosanquet & Pullen, 551, was a suit on a bond given to secure the payment of the price of goods, sold and delivered by the plaintiff to the defendant in London, to be shipped to Ostend, and thence re-shipped to the East Indies, to be trafficked with clandestinely, and without the license of authority of the East India Company, the plaintiff well knowing that the said goods were so to be trafficked with, and disposed of. The court held, that it being prohibited by the positive law of the country to furnish goods for such purpose, the contract was void. And although the prohibition attaches only on the person who has the immediate interest in the supply, and although those who are more remotely concerned in furnishing the supply, may not be directly within the scope of the act, it will not follow that their contracts are valid. Eyre, C. J., said : " Upon the principles of the common law, the consideration of every valid contract must be meritorious. The sale and delivery of goods —nay, the agreement to sell and deliver goods is, *prima facie*, a meritorious consideration to support a contract for the price. But the man who sold arsenic to one who he knew intended to poison his wife with it, would not be allowed to maintain an action upon his contract. The consideration of the contract, in itself good, is thereby tainted with turpitude, which destroys the whole merit of it. Other cases, where the means of transgressing a law are furnished, with knowledge that they are intended to be used for that purpose, will differ a shade more or less from this strong case. But the body of the color is the same in all. No man ought to furnish another with the means of trans-

Davis v. Bronson.

gressing the law, knowing that he intended to make that use of them."

The case of *Langton* v. *Hughes*, 1 Maule & Selwyn, 593, was for the price of certain drugs, sold by the plaintiff to a brewer, with the knowledge that they were for the purpose of being used in the brewery, contrary to law. Lord Ellenborough said: "A person who sells drugs with the knowledge that they are meant to be mixed, may be said to cause or procure, *quantum in ille*, the drugs to be mixed. What is done in contravention of an act of parliament, cannot be made the subject matter of an action. And although the case does not show that the drugs were, in fact, mixed, but they were sold with a view to be mixed; and the court will not give sanction to a contract entered into against the policy of the law."

In *Wetherell* v. *Jones*, 3 Barnwell & Adolphus, 225, Lord Tenterden said: "When a contract which a plaintiff seeks to enforce is expressly, or by implication, forbidden by the statute or common law, no court will lend assistance to give it effect. And there are numerous cases in the books, where an action on a contract has failed, because either the consideration for the promise, or the act to be done, was illegal, as being against the express provision of the law, or contrary to justice, morality or sound policy."

That the law is in accordance with the authority of these decisions, when the contract is sought to be enforced in the jurisdiction where it was made, we think there can be little reason to doubt. Does it make any difference, that the contract was consummated in Illinois, and was not prohibited by the laws of that State? If, as averred in the answer of defendant, the liquors were sold and shipped to defendant, with a view to enable him to violate the laws of the State of Iowa, we think the plaintiff cannot recover. No State is bound to lend the assistance of its courts, to enable a party to evade or contravene its laws, or to enforce a contract subversive of its policy or institutions. It can make no difference that the contract was valid in Illi-

nois, and might have been enforced in the courts of that State.

The law of the place where the thing happens, (says Lord Mansfield), does not always prevail.   In many coun-tries, a contract may be maintained by a courtesan, for the price of her prostitution, and one may suppose an action to be brought here upon such a contract, which arose in such a country.   But that would never be allowed in this coun-try.   Therefore, the *lex loci* cannot, in all cases, govern and direct.   *Robinson* v. *Bland*, 2 Burrows, 1077, 1084. See also, *Greenwood* v. *Curtis*, 6 Mass., 358, 379, in which Parsons, C. J., says :   " This contract, if lawful where it was made, could not be the legal ground of an action here ; for the  consideration  is confessedly immoral, and a judg-ment in support of it, would be  pernicious from its exam-ple."

By the prohibitory liquor law of the State of Iowa, the sale of intoxicating liquors, or the keeping of the same for sale within the State, is, under heavy penalties, prohibit-ed, and the liquors, with the vessels in which they are con-tained, are declared to be a nuisance and subject to forfeit-ure, and when ascertained to be so kept, they may be or-dered to be destroyed.   By virtue of this act, the total pro-hibition of the manufacture and sale of intoxicating li-quors, had become the settled policy of the State.   *The State* v. *Geebrick*, 5 Iowa, 491.  Whether the consideration of the contract of  sale, in this instance, was immoral or not, there can be no question, that if made with intent to enable the defendant to sell the liquors within this State, in viola-tion of our laws, it was opposed to the policy of the State, and cannot be enforced.

The State of Iowa, as an independent community, may judge and determine for herself, how far the obligation of comity to a neighboring State, renders it becoming in her to give effect to contracts made within such neighboring State, and valid there, but which may be prejudicial to her interests, and entered into with a view to the violation of her laws.   This comity is, in all cases, a voluntary conces-

sion on the part of the State by whom it is offered, and is inadmissible, when contrary to its policy, or prejudicial to its interests. *Bank of Augusta* v. *Earle*, 13 Peters, 589. The State, in the exercise of her rights, and in defence of her policy and interests, has chosen to declare that no action of any kind shall be maintained in the courts of the State, for the value of any intoxicating liquor sold in any other State, with intent to enable any person to violate the provisions of the act for the suppression of intemperance.

The plaintiff, by his demurrer, admits that the liquors were sold to the defendant, to enable him to violate this law of the State.   It is claimed by him, however, that this provision of the law is unconstitutional and void, as operating to impair the obligation of contracts.   The law was not intended to affect the obligation of contracts, in the sense in which these words are used in the constitution. This law was in force when the contract was made, and can, therefore, in no legal sense, be said to impair its obligation.   Laws made subsequent to the formation of a contract, may certainly operate so as to impair its obligation. But laws made prior to the formation of the contract, cannot do so, because all existing laws enter into contracts when made under them, and define and determine that contract.   2 Parsons on Conts., 537.   The contract was so far made, in this instance, with reference to the law, that it appears from the pleadings, that it was entered into by the parties with a view to the violation of the law, which it is now argued impaired its obligation.

We think the demurrer was properly overruled, and the judgment of the district court will be affirmed.

Judgment affirmed.